## UNITED STATES BANKRUPTCY COURT
## IN THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**IN RE:**                                      **CASE NO.: 08-40084-LMK**

**OLIN CONSTRUCTION COMPANY, INC.**            **Chapter 11**

    **Debtors.**

_____/

## FIRST AMENDED DISCLOSURE STATEMENT

Olin Construction Company, Inc., Debtor's and Debtors-In-Possession, (hereinafter

Debtor), hereby submits its Disclosure Statement to all known creditors and other parties in

interest, pursuant to 11 U.S.C. 1126.

## I. INTRODUCTION

1. On February 13, 2008, Debtor filed a Voluntary Petition for Relief under Chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Florida,

Tallahassee Division. Debtors' Bankruptcy estate is being administered under Case Number 08-

40084-LMK, before the Honorable Lewis M. Killian, Jr., U.S. Bankruptcy Judge.

2.      Pursuant to the provisions of the United States Bankruptcy Code, this Disclosure Statement is

presented for approval by the Bankruptcy Court. Such approval is that which is required by Statute

and does not constitute a Judgment by the Court as to the desirability of Debtors' Plan of

Reorganization (hereinafter called "Plan") or as to the value and suitability of any consideration

offered thereby. Interested parties are referred to in 11 U.S.C. 1126. Debtor has prepared this

Disclosure Statement to disclose that information which, in its opinion, is material, important and

necessary to the evaluation of the "Plan". The material contained herein is intended solely for that

purpose and the use of known creditors of Debtor, and, accordingly, may not be relied upon for any

purpose other than the "Plan". A true copy of the "Plan", as filed with the Bankruptcy Court, is attached hereto as Exhibit 1.

3. The Bankruptcy Court has fixed _____ as the last day by which ballots accepting or rejecting the "Plan" must be received. No vote received and dated after such time will be counted. Whether a creditor or interest holder votes on the "Plan" or not, such person or entity will be bound be the terms and treatments set forth in the "Plan" if the "Plan" is accepted by the requisite majorities of groups of creditors and interest holders and/or is confirmed by the Court. Allowance of a claim or interest for voting purposes, and disallowance of any claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will be allowed or disallowed for distribution purposes.

4. In order for the "Plan" to be accepted by the creditors, more than one-half in number and at least two-thirds of the amount of claims allowed (for voting purposes) and actually voting on each impaired class of creditors must vote to accept the "Plan". The Bankruptcy Court has the authority, if certain conditions are met, to confirm the "Plan". Upon approval of the Disclosure Statement, you will be furnished with a ballot to vote on the "Plan". Please be sure to properly complete the ballot and legibly identify the name of the claimant or interest holder.

5. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. EVERY EFFORT HAS BEEN MADE TO ENSURE THAT THE INFORMATION CONTAINED HEREIN IS ACCURATE; HOWEVER, DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THIS INFORMATION IS WITHOUT ANY INACCURACY.

6. NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED BY DEBTOR, OTHER THAN AS SET FORTH WITHIN THIS DISCLOSURE STATEMENT.

## II. DESCRIPTION OF DEBTORS

2

A. History and Past Operations

7.  Olin Construction Company commenced operation in 1986. Olin Granthum, the principal, had been in construction for over 15 years and decided to sit for his state General Contractor License and go into business for himself. The corporation first started off doing small jobs such as decks, remodeling, etc. After that it started building houses. As this business grew and jobs got bigger, all income was put back into the business. The Corporation built most of the houses that are in Hartsfield Plantation and received many awards for the work on these houses; best overall, most energy efficient and best value. It became clear that if the Corporation was going to make any real money, it would have to start developing its own land for lots to build on. The first development was the Ventanas, which is a townhouse development off of John Knox Road. As the project became a success, phase 2 was started and was called Hillcrest. As Hillcrest became a success, land was purchased in Carrabelle, Florida to build a townhouse development called Sands of Carrabelle.

The entire time that the corporation was developing, Olin Granthum, its president, joined the Tallahassee Builders Association and worked his way through the ranks to become President of the TBA in 1995 and 1996. He learned how to do things the right way and how to get help within the builders association to grow the business. He went to all the conventions and took classes in things he needed to know such as how to buy the right software, hire the right people and get funding for projects.

He served on the Board of Directors for the Florida Home Builder Association on a state level and served on the Board of Directors on the National Level as well. He serves on these boards today.

After the Sands of Carrabelle became a success, the corporation started looking for more land and more projects. On January 14, 2005, he entered into a contract to buy additional

3

land in Carrabelle. He got a good contract, with six months for due diligence and to get zoning approved before closing. The project needed a good engineering firm to help with the project and selected a reputable firm called Moore Bass Consulting Inc. On January 20, 2005, the corporation contracted with Moore Bass to do the boundary survey, topographical survey, existing utility survey and existing conditions and improvements. Moore Bass later advised that the site was suitable for development of a commercial/residential shopping center and that there was an existing sewer line adjacent to the property on two sides. Relying on this favorable information, Moore Bass Consulting Inc. was hired on or around on March 21, 2005, to provide additional professional engineering services to include preparing applications for permit approval through Franklin County and the City of Carrabelle, FDEP, utility for sewer and water systems design, utility placement permits, etc.

Final environmental construction plans were received on April 29, 2005 and on May 5, 2005, the City of Carrabelle voted approval of the site development plan. Upon relying on the construction documents provided by Moore Bass, that the property was suitable for development, the contract was extended to July 24, 2005, to allow for financing and closing on the property on August 12, 2005. Immediately reservations for lot sales were started on the property to begin construction.

On October 4, 2005, Moore Bass secured a Florida Department of Environmental Protection storm water permit allowing the corporation to begin earthwork on the site. Moore Bass did not get their vacuum sewer system approved and after fourteen months following submission of the initial plans, Olin Construction Company, Inc. was told their system would not work and it would have to design a new pump lift station and pump approximately 898 feet of forced main to connect to the sewer.

4

To make matters worse, there was a slow down in the market after a year had passed and all of the buyers who had reservation contracts wanted their deposits back.

Not only did the design not work, there was not a sewer hook up line at the property as the Moore Bass surveyor had indicated before the corporation purchased the property.

Olin Construction Company, Inc. was stuck with a piece of property that it could not develop nor sell which took away the ability to borrow money to continue with other projects that could be built and sold. At that time, the corporation knew it would eventually have to file for bankruptcy protection. Suit was commenced against Moore Bass Consulting, Inc. and others for Breach of Contract and other matters and the lawsuit is currently pending.

In 2007, the corporation commenced selling off all assets in order to pay interest payments to starve off bankruptcy. In addition, Olin Granthum took out a second mortgage on his personal home to keep moving forward and to finance the lawsuit in hopes that its resolution would fix things.

B. Assets and Liabilities

8. At the time of filing of these proceedings, the Debtor had four (4) secured debts, and ten (10) unsecured creditors. The aggregate of all known debt, including contingent debt, if any, as of the date of filing of the petition was approximately $4,676,600.17 Debtors' assets, at fair market value, amounted to $5,276,900.00. An analysis of Debtors assets and liabilities, as of the date of the initial pleadings is attached hereto as Disclosure Statement Exhibit 2.

9. During the pendency of these proceedings, the Debtor attempted to market several of its properties with some interest, but to no avail. The Debtor has collected approximately $9,500.00 in deposit and insurance refunds which it has in a DIP account. Through agreement with pre-petition state court counsel, retained herein by court order as "special counsel", Debtor has continued the breach of contract litigation against Moore Bass Consulting and others.

5

### III. PLAN OF REORGANIZATION

10. The Plan of Reorganization provides for four (4) groups of claims with each group having one or more sub-classes. (See attached "Plan", Disclosure Statement Exhibit 1.)

11. Debtor has analyzed the Schedule of Creditors in the Petition, as amended, as well as the Official Claims file as of the date of this Disclosure Statement and made the following assumptions regarding allowable claims of all creditors. Claims of creditors are divided into the following groups:

Group 1 – Class I – All administrative claims against Debtors, namely attorney fees and U.S. Trustee fees.

Group 2 – Class II – All Priority Tax Claims

Group 3- Class III- All Secured Claims

Group 4 – Class IV – Unsecured Claims

12. The Debtor generated its income from residential and commercial construction and development. Due to the down turn in the coastal construction and investment as well as a substantial breach of contract as to a coastal commercial development, Debtor ceased operating and filed for protection under Chapter 11 under the United States Bankruptcy Code.

13. Monthly operating statements have been filed with the Court. Said statements initially reflect small monthly balances based upon deposit refunds and Debtor's shutting down its operating practices under Chapter 11. Debtor's small cash flow from boat slip rental will cease upon the sale of the particular property, or surrender/relief from stay to Ameris Bank pursuant to a previously entered consented to Adequate Protection Order.

14. Debtor believes that the Plan of Reorganization (Disclosure Statement Exhibit 1) is in the best interest of its creditors.

### IV. GROUPS OF CREDITORS AND TREATMENT OF CLAIMS

15. Group 1- Class I:  Administrative Expenses/Debtor's Professionals

These claims include: claims against Debtors' estate as allowed by Order of the Bankruptcy

Court, pursuant to Title 11 U.S.C. 503. (b) and include, without limitation, the compensation

and reimbursement for professional services rendered and expenses incurred by Debtors'

attorney(s), other professionals, and other claims, including fees due the Office of the U.S.

Trustee, arising after the commencement of Debtors' Chapter 11 case. These claims presently

are estimated upon confirmation as follows:

> Attorney fees (DIP counsel) – estimated $13,000.00, in addition to initial retainer, to be
> paid from proceeds from the lawsuit recovery.

> Attorney fees (special counsel) unknown, upon Court application and to be paid from
> law suit recovery

> U.S. Trustee fees - $325.00

These fees will be paid through cash on hand and the generation of excess income from the

lawsuit recovery prior to Debtors' "Plan" or subsequent thereto under agreement with the

professional.  Said payments will be made upon allowance of such claims by Final Order of the

Bankruptcy Court, and post-confirmation claims arising in relation to the "Plan", including

defense or prosecution on behalf of Debtor against third parties, and shall be allowed and paid

from the cash generated from Debtors' pending lawsuit, if any, and cash on hold.  Any

outstanding U.S. Trustee fees at time of closing of the estate shall be paid in full in cash.

16. The "Plan" divides the remaining creditors of Debtors into three (3) additional groups.

Classification and treatment of such groups under the "Plan" is described below:

(a) Group 2 – Class II : Priority Tax Claims: Doris Maloy, Tax Collector

Doris Maloy, Tax Collector for Leon County, Florida has a secured priority real    property tax

claim on Victory Garden West, 45 feet of lot 37, Block B in the amount of $290.25. This real

property is part of a residence sold by Debtor on or around 2003, but erroneously not

7

transferred by deed at closing. Debtor is presently trying to coordinate to have the real property properly transferred to the buyer through the closing agent. Upon the effective date of the Plan, if a transfer of the real property and satisfaction of the claim is not satisfied, Debtor shall pay said claim, in full, in cash.

(b) Group 3 Class III - Secured Creditors:

Class III A.    Ameris Bank has a secured claim of approximately $525,123.54 as of the date of Debtors petition on a permitted commercial lot located on the Carrabelle River in Carrabelle, Florida. The lot is fully permitted for five (5) condominiums, has an existing dock permitted for up to ten (10) boat slips, with utilities and submerged land lease. A structured Relief from Stay order has been entered allowing Debtor to enter into a sales contract prior to June 30, 2008. Debtor was unable to produce a contract; and, as such, hereby surrenders the property to said creditor in full satisfaction of the debt, upon recording of Debtors Plan of Reorganization as Confirmed by the U.S. Bankruptcy Court. See legal description attached hereto as Exhibit 5.

Class III B. Superior Bank has a secured claim in the approximate amount of $283,741.57 as of the date of Debtors petition. Said claim is secured by a lot and townhouse located in the Sands of Carrabelle. See legal description, attached hereto as Exhibit 6. Debtor hereby surrenders said real property identified in Exhibit 6, as attached hereto, in full satisfaction of said debt, upon recording of Debtor's Plan of Reorganization as Confirmed by the U.S. Bankruptcy Court.

Class III C. Superior Bank has a secured claim in the approximate amount of $942,152.14 as of the date of Debtors petition. Said claim is secured by 15 lots in the Sands of Carrabelle development, two (2) lots in Picketts Addition to the City of Carrabelle and Lot 20 in Anglers Harbin. See legal description attached hereto as Exhibit 7. Debtor surrenders said

8

real property identified in Exhibit G, as attached hereto, in full satisfaction of said debt, upon recording of Debtor's Plan of Reorganization as Confirmed by the U.S. Bankruptcy Court.

Class III D. Wakulla Bank has a secured claim on a debt of $2,018,417.26 on sixteen (16) commercial, platted real property lots, located on U.S. Highway 98 in Carrabelle, Florida. Said real property has an approximate value of $1,706,400.00, according to the Motion for Relief from Stay as filed by Wakulla Bank and its Proof if Claim as filed in these proceedings, leaving an unsecured debt portion of $312,017.20 as of the date of the filing of Debtors petition. Said claim is partially secured by the multiple commercial lots. See legal description, attached hereto as Exhibit 8. Debtor hereby surrenders said real property identified in Exhibit 8, as attached hereto, in full satisfaction of Wakulla Banks secured portion of its claim, upon recording of Debtor's Plan of Reorganization as confirmed by the U.S. Bankruptcy Court.

(b) Group 4 Class IV Unsecured Creditors:

Class IV- General Unsecured Creditors. Debtor's general unsecured creditors have aggregate and/or estimated claims of $2,206,145.29. Said creditors shall be paid pro rata, after administrative claims, from the proceeds, if any, from Debtor pending civil law suit against Moore Bass Consulting, Inc. and others, if any. If funds are available to pay one hundred (100) percent of the claim, interest of at least (6) percent, will be paid. This class is impaired as that term is defined in the Bankruptcy Code; and such, Debtor intends to use the provision of 11 U.S.C. 1129(b)[cramdown], if necessary.

## V. PROCEDURE WITH RESPECT TO FILING OBJECTIONS TO CLAIMS

17. In accordance with the Order of the Bankruptcy Court, all claims, other than administrative and claims arising as a result of Debtor's rejection of executory contracts and leases must have been filed with the Bankruptcy Court no later than June 11, 2008.

All claims arising from rejections of executory contracts and leases, if any, must have been filed with the Bankruptcy Court, with a copy to Debtors' attorney, on or before the effective date of the "Plan". Creditors whose claims have been listed on Debtors' schedules, as amended, which are on file with the Bankruptcy Court, as non-disputed, non-contingent or liquidated shall not be required to file claims. Debtor shall, at least forty-five (45) days prior to the confirmation hearing or from the deadline for filing claims which has been imposed by the Bankruptcy Court, whichever may be later, interpose Objections to the allowance of filed claims, unless such time shall have been extended by Order of the Bankruptcy Court. Failure of Debtor to object to or examine any claim for the purpose of voting on the "Plan", shall not be deemed a waiver of Debtors' right to object or re-examine such claims in whole or in part for the purposes of allowance and distribution. Creditors listed in Debtor's initial schedules, and any amendments thereto, as disputed shall be required to file a claim in these proceedings prior to the June 11, 2008, bar date. Absent a valid claim, said listed creditors shall be barred from participation and distribution in Debtor's Plan of Reorganization, pursuant to the United States Bankruptcy Code.

## VI. OPERATION OF DEBTOR SUBSEQUENT TO THE CONFIRMATION OF THE "PLAN"

18. After Confirmation of the "Plan", the prosecution of any claims against third parties, and the distribution of monies to creditors as outlined in the "Plan". Debtor shall cease to operate as Debtor-in-Possession. Upon distribution of proceeds, if any, from its pending law suit, Debtor shall cease to operate. Debtor anticipates that "substantial consummation" of the Plan of Reorganization, as proposed, should not exceed one (1) year from Confirmation.

19. THE FOREGOING IS THE SUMMARY OF THE "PLAN" AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE URGED TO READ THE

"PLAN" IN FULL BEFORE FILING THEIR ACCEPTANCE OR REJECTION OF THE
"PLAN".

20. Creditors in Group 1 and Group 2 are unimpaired; therefore, pursuant to 11 U.S.C. 1126
(f) are deemed to accept the "Plan". Creditors in Group 3, Class A through D and Group 4,
Class IV, claims are impaired, as that term is defined in the "Plan" (unless such claims have
been previously allowed for voting purposes), and may vote to accept or reject the "Plan".

## VII. CLAIMS OF DEBTOR TO BE PROSECUTED BY DEBTORS IN ACCORDANCE
## WITH THE "PLAN"

21.     Debtors' books and record have been examined for the purpose of verifying any
transfer of payments that would be a preference within the meaning of 11 U.S.C. 547.  All
payments or transfers that were made within ninety (90) days of filing appear to be in the
ordinary course of business, therefore, not avoidable under 11 U.S.C. 546 (c). If, however, any
avoidable transfers are discovered, Debtor will proceed as authorized under the Bankruptcy
Code.

22. Claims against third parties:

Debtor is currently involved in State Court litigation against Moore Bass Consulting Inc.,
and others and will continue until said suit is finalized and any proceeds are distributed as set
forth herein. No other litigation outside of the Bankruptcy Court is anticipated; however, if
preferences are discovered, Debtor will utilize provisions of the Bankruptcy Code to proceed
against said preferences.

## VIII. ALTERNATIVE TO THE PROPOSED "PLAN"

23. If the "Plan" is not approved by Debtor creditors and confirmed by the Bankruptcy
Court, the alternative will be to convert this Chapter 11 proceeding to a straight Chapter 7,
requiring liquidation of non-exempt assets by a Trustee or dismissal of the Case. To dismiss

these Proceedings without a confirmed Plan of Reorganization or to convert to a Chapter 7 would eliminate any dividend to Debtor's unsecured creditors. Debtor feels that this "Plan" will provide a dividend, to all creditors well in excess of liquidation value.

## IX. DEBTORS' CASH PROJECTION ANALYSIS

24. Attached hereto as Disclosure Statement Exhibit 3, is Debtors' cash projection analysis, which sets forth the post-petition actual operations and projected quarterly cash operations.

## X.  LIQUIDATION ANALYSIS

25. Attached hereto as Disclosure Statement Exhibit 4, is Debtor's liquidation analysis as of the date of this Disclosure Statement. The figures on liquidation are a "best case" estimate by Debtor. There are no assets of substantial value, which could be liquidated by a Chapter 7 Trustee other than as set forth on Exhibit 4. Said assets would offer little or no equity over secured, administrative and priority debt for payment of a dividend to Group 4, unsecured creditors. Said liquidation value, as it would relate to the Class IV general unsecured creditors, being zero (0) percent compared to the contingents dividend as contemplated under Debtor's Plan of Reorganization.

## XI. PLAN FUNDING

26. Pursuant to cash projections and subsequent to the filing of this Disclosure Statement and Plan of Reorganization, Debtor should have sufficient cash upon collection settlement of its pending litigation to fund its Plan.  See Cash Flow Projection Exhibit 3 attached hereto. Should Debtor prevail in its currently pending litigation, any funds collected shall, after court approval of any fees and cost to Debtors Special Counsel and payment thereof, shall be deposited into the Trustee Account of Debtors Attorney and disbursed first to any unpaid administrative creditors, then to any priority tax creditor, then pro-rata to the Debtors unsecured

creditor, with interest if one hundred (100) percent distribution is possible. Debtor shall

provide a full accounting to all creditors upon distribution.

## XII. POST-CONFIRMATION

27. As intended, after Confirmation of Debtors' Plan of Reorganization, Debtor will

continue its pending litigation and collection thereof, if any, fund Debtor's Plan payments, if

feasible.

## XIII. CONCLUSION

28. Accordingly, Debtor believes that its proposed Plan of Reorganization is in the best

interest of the creditors of the Estate and should be accepted.

DATED: this 4th day of August, 2008.

/S/Thomas B. Woodward
Thomas B. Woodward
Attorney for Debtor
FL. BAR NO. 0185506
Post Office Box 10058
Tallahassee, Florida 32302
(850) 222-4818

Olin Construction Co., Inc.

/S/ Olin Granthum
By: Olin Granthum
Its President

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**IN RE:**                                         **CASE NO.: 08-40084-LMK**

**OLIN CONSTRUCTION COMPANY INC.**          **CHAPTER 11**

   **Debtor.**
_____/

### FIRST AMENDED PLAN OF REORGANIZATION

Olin Construction Company Inc., Debtor and Debtor-In-Possession, ("Debtor"), proposes the

following First Amended Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code.

### ARTICLE 1

### DEFINITIONS AND CONSTRUCTION OF TERMS

The following terms when used in this Plan have the following meanings:

1.01    Administrative Expense Claim means any right to payment constituting a cost or

expense of administration of the Chapter 11 case under sections 503(b) and 507(a)(1) of the

Bankruptcy Code, including, without limitation, any actual and necessary cost and expenses of

preserving the estate of the Debtor, any actual and necessary cost and expenses of operating the

business of the Debtor, any indebtedness or obligations incurred or assumed by the Debtor in

Possession in connection with the conduct of then business, including, without limitation, for the

acquisition or lease of property or an interest in property or the rendition of services, all

compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court

under section 330 or 503 of the Bankruptcy Code.  Any fees or charges assessed against the estate

of the Debtor under section 1930 of Chapter 123 of title 28 of the United States Code shall be

excluded from the definition of Administrative Expense Claim and shall be paid in accordance

with Section 4.01 of the Plan.

1.02    Allowed means, with references to any Claim against the Debtors, (i) any claim

that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the

Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and

not disputed or contingent and for which no contrary proof of claim has been filed,(ii) any Claim

allowed hereunder, (iii) any Claim that is not disputed, (iv) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Reorganized Debtor pursuant to a Final Order of the Bankruptcy Court or under Section 6.06 of the Plan, or (v) any Claim that, if disputed, has been allowed by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Commencement Date.

1.03     "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, 11 U.S.C. Section 101, et seq., as amended, which governs this reorganization proceeding.

1.04     Ballot means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which is to be indicated (i) acceptance or rejection of the plan.

1.05     Bankruptcy Court means the United States Bankruptcy Court for the Northern District of Florida having jurisdiction over the Chapter 11 Case.

1.06     Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.07     Business Day means any day other than a Saturday, Sunday, or any other day on which commercial banks in Florida are required or authorized to close by law or executive order.

1.08     Causes of Action means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable or directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole

2

or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases, including through the Effective Date.

1.09    Claim shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.10    Collateral means any property or interest in property of the estate of the Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.11    "Confirmation Date" shall mean the date on which the Bankruptcy Court shall enter an order confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

1.12    "Confirmation Order" shall mean entry of an order by the Bankruptcy Court confirming the provisions of this Plan pursuant to section 1129 of the Bankruptcy Code.

1.13    Disputed means, with reference to any Claim, any Claim proof of which was timely and properly filed, and in such case or in the case of an Administrative Expense Claim, any Administrative Expense Claim or Claim which is disputed under the Plan or as to which the Debtor has interposed a timely objection and /or request for estimation in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. A claim that is Disputed by the Debtor as to its amount only, shall be deemed Allowed in the amount the Debtor admits owing, if any, and Disputed as to the excess.    1.14    "Effective Date of This Plan" shall be thirty (30) days subsequent to the date the Court enters its Order Confirming this Plan, provided that no stay of the Confirmation Order is then in effect.

1.15    "General Unsecured Claim" shall mean any Claim against the estate of the Debtor other than an Administrative Claim, a Priority Claim or a Secured Claim.

3

1.16    "General Unsecured Creditor" shall mean the holder of an Allowed General Unsecured Claim, to include estimated claims.

1.17    "Ordinary Operating Costs" shall mean the Debtor-In-Possession's monthly expenses necessary for its operation and to carry out the Plan.

1.18    "Pending Claim" shall mean a claim for which an application for allowance is pending before the Bankruptcy Court on the effective date of the Plan or an Application for an Administrative Claim which is filed with the Bankruptcy Court subsequent to the effective date of this Plan but prior to the date that the Debtor's estate is closed.

1.19    "Post Confirmation Administrative Claims" shall mean claims incurred by the Debtor's estate after the Confirmation Date of this Plan in the prosecution and defense of actions and claims as described in paragraph 6.02 and 6.04 of this Plan, including without limitation, claims for services rendered and reimbursements of expenses incurred by Debtor's attorneys, accountants, appraisers or other professionals.

1.20    "Plan" shall mean this Plan of Reorganization in its present form or as it may be modified, amended or supplemented from time to time.

1.21    "Priority Claim" shall mean a claim entitled to priority treatment under 11 U.S.C. Section 507 (a) (2) – (a) (6).

1.22    "Rejection Claim" shall mean a claim arising under 11 U.S.C. Section 502 (g) from rejection under 11 U.S.C. Section 365 or under this Plan of an executory contract or unexpired lease of the debtor that has not been assumed.

1.23    "Reorganization Proceeding" shall mean this proceeding under Chapter 11 for the reorganization of the Debtor which presently is being administered under Case No. 08-40084-LMK

1.24    Schedules means the schedules of assets and liabilities, and the statement of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and

4

Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.25     Interpretation; Application of Definitions and Rules of Construction. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan. The words "herein", "hereof", "hereto", "hereunder", and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II

## TREATMENT OF ADMINISTRATIVE

## EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

2.01     Administrative Expense Claims. Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Administrative Expense Claim on the later of the Effective Date or the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter is as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtor in Possession or liabilities arising under loans or advances to or other obligations incurred by the Debtor in

5

Possession shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.02    Professional Compensation and Reimbursement Claims. All entities seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 503(b) (2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are allowed by the Bankruptcy Court. (a) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (b) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Reorganized Debtors. But in any event, said allowed Administrative Expense Claim shall not be paid unless funds are received from Debtors pending lawsuit against Moore Bass Consulting, Inc. and others. All U.S. Trustee fees shall be paid, in full, when due, prior to the closing of the Bankruptcy Estate.

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

For purposes of this Plan, there shall be four (4) groups of claims and interest, as follows:

| 3.01 | Group 1 | - Class I  All administrative claims. |
| 3.02 | Group 2 | - Class II  All allowed secured priority claims. |
| 3.03 | Group 3 | -All allowed secured claim, divided into classes as follows: |

6

|  | Class III -A | Ameris Bank |
|--|--------------|-------------|
|  | Class III-B | Superior Bank |
|  | Class III-C | Superior Bank |
|  | Class III-D | Wakulla Bank |
| 3.04 | Group 4 | - All allowed unsecured claim. |
|  | Class IV-A | Unsecured Creditors. |

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

## THAT ARE NOT IMPAIRED UNDER THIS PLAN

The following classes of claims and interests are not impaired under the provisions of this Plan:

4.01    The allowed Administrative claims of Class I creditors, shall be paid in full, in cash as available, on the effective date of the Plan or upon the allowance of such claims by final order of the Bankruptcy Court, whichever may be applicable upon recovery of monies if any, from pending breach of contract litigation. These claims consist of professional services of Debtors' attorney's, above any initial retainer, and the Office of the U.S. Trustee and are estimated as follows:

Attorney/Bankruptcy     $13,000.00 (estimated) in addition to the retainer paid

Special Counsel unknown pending success and recovery in pending state court action

U.S. Trustee     $ 325.00 (estimated)

## ARTICLE V

## TREATMENT OF CLAIMS AND INTERESTS

## THAT ARE IMPAIRED UNDER THIS PLAN

7

5.01    There are five (5) classes of impaired creditors under Debtor's Plan as that term is defined in the Bankruptcy Code and this Plan; namely:

Class III A.    Ameris Bank has a secured claim of approximately $525,123.54 as of the date of Debtors petition on a permitted commercial lot located on the Carrabelle River in Carrabelle, Florida. See legal description, attached hereto as Exhibit E. The lot is fully permitted for five (5) condominiums, has an existing dock for up to ten (10) boat slips, with utilities and submerged land lease. A structured Relief from Stay Order has been entered allowing Debtor to enter into a sales contract prior to June 30, 2008. Debtor was unable to produce a contract; and, as such, hereby surrenders said real property identified in Exhibit E, as attached hereto, to said creditor in full satisfaction of the debt, upon recording of Debtors Plan of Reorganization as Confirmed by the U.S.

Class III B. Superior Bank has a secured claim in the approximate amount of $283,741.57 as of the date of Debtors petition. Said claim is secured by a lot and townhouses located in the Sands of Carrabelle. See legal description, attached hereto as Exhibit F. Debtor hereby surrenders said real property identified in Exhibit F, as attached hereto, in full satisfaction of said debt, upon recording of Debtor's Plan of Reorganization as Confirmed by the U.S. Bankruptcy Court.

Class III C. Superior Bank has a secured claim in the approximate amount of $942,152.14 as of the date of Debtors petition. Said claim is secured by 15 lots in the Sands of Carrabelle development, two (2) lots in Picketts Addition to the City of Carrabelle and Lot 20 in Anglers Harbor, in Carrabelle, Florida. See legal description attached hereto as Exhibit G. Debtor surrenders said real property identified in Exhibit G, as attached hereto, in full satisfaction of said debt, upon recording of Debtor's Plan of Reorganization as Confirmed by the U.S. Bankruptcy Court.

Class III D.    Wakulla Bank has a secured claim on a debt of $2,018,417.26 on sixteen (16) commercial, platted real property lots, located on U.S. Highway 98 in Carrabelle, Florida.

8

Based upon the value of the real property of $1,706,400.00 as set forth in the Motion for Relief from Stay as filed by Wakulla Bank and its Proof of Claim as filed in these proceedings, the unsecured debt portion is $312,017.20 as of the date of the filing of Debtors petition. Said claim is partially secured by the multiple commercial lots. See legal description, attached hereto as Exhibit H. Debtor hereby surrenders said real property identified in Exhibit H, as attached hereto, in full satisfaction of Wakulla Banks secured portion of its claim, upon recording of Debtor's Plan of Reorganization as confirmed by the U.S. Bankruptcy Court.

(b) Group 4 Class IV Unsecured Creditors:

Class IV-    General Unsecured Creditors. Debtor's general unsecured creditors have aggregate and/or estimated claims of $1,206,164.30. Said creditors shall be paid pro rata, after administrative claims, from the proceeds, if any, from Debtor pending civil law suit against Moore Bass Consulting, Inc. and others, if any. If funds are available to pay one hundred (100) percent of the claim, interest of at least (6) percent, will be paid.

## ARTICLE VI

## MEANS FOR EXECUTION OF THE PLAN

6.01    Debtor shall fund its Plan from recovery of any monies from its pending state court litigation against Moore Bass Consulting, Inc. and others.

6.02    All rejection or surrender deficiency claims must be filed with the Bankruptcy Court, with a copy to the attorney for the Debtor, on or before forty-five (45) days prior to the date of the Court's Confirmation hearing. The Debtor will have thirty (30) days in which to allow such claims. If not so allowed, it will be deemed disputed.

6.03    Attached as Exhibits A, B and C are abstracts of allowed claims filed for secured/unsecured priority, secured creditors, and unsecured creditors respectively. The Exhibits include a list of all allowed claims by classes and the allowed amount by the Debtor. If the dollar amount of the listed allowed claim is deemed incorrect, the creditor must notify the Debtor and their attorney in writing within thirty (30) days of receipt of this Plan stating the amount believed

9

to be correct. If the parties are able to agree on a corrected amount, the amount of the listed claim will be amended accordingly. Approval of the "Plan" shall constitute approval of the amount of the listed "allowed" claim unless an objection to the amount listed has been served and filed prior to the approval of the Plan. Disputed claims, as valued by the Debtor, will be allowed for voting purpose, and the Debtor will not object to such creditors voting on the "Plan". Failure by the Debtor to object to or to examine any claim for the purposes of voting on this Plan shall not be deemed a waiver of the Debtor's right to object to or to re-examine such claim in whole or in part. Debtor and creditors will schedule resolutions of disputed claims including disputed amounts with the Bankruptcy Court as soon as practical, and if

possible, within thirty (30) days prior to confirmation hearing of this Plan. Disputed claims shall not participate in a dividend hereunder unless a valid claim was filed with the Bankruptcy Court on or before June 11, 2008, the bar date set by the Court or other such dates as the Court has set, and any objections have been resolved.

6.04        On the Effective Date of this "Plan", and after satisfaction in full of allowed administrative claims, through its attorney, the Debtor, as disbursing agents, shall commence payments as set forth in Articles IV and V of this "Plan". Should funds be available for a one hundred (100) percent dividend, interest, if funds are available, will be paid to the Class IV creditors.

6.05        Holders of Post Confirmation Administrative Claims which arise in connection with the prosecution of actions to secure and defend the property of the Debtor's estate shall be compensated for services rendered and reimbursed for actual expenses incurred from the recovery of monies, if any, from the Debtor's pending state court litigation, upon Ordered the Bankruptcy Court and prior to distribution to the Class IV creditors.

6.06        Debtor anticipates the execution of this Plan (substantial consummation), as proposed, should not exceed one (1) year from confirmation.

## **ARTICLE VII**

10

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.01        All executory contracts and unexpired leases of the Debtor, or portions
thereof, not previously rejected or assumed or assigned under 11 U.S.C. Section 345 with
approval of the Bankruptcy Court are hereby rejected.

7.02        All rejection or surrender deficiency claims are to be filed, objected to
and determined in accordance with the provisions of Paragraph 6.03 and 6.04 of this "Plan".

## ARTICLE VIII

## RETENTION OF JURISDICTION

8.01. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of,
and related to, the Chapter 11 Case and Plan pursuant to, and for the purpose of, sections 105(a)
and 1142 of the Bankruptcy Code and for, among other thing, the following purposes:

(a)        To hear and determine pending applications for the assumption or rejection of
executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting
therefrom;

(b)        To hear and determine any and all adversary proceedings, applications and
contested matters;

(c)        To hear and determine any objections to Administrative Expense Claims or
Claims;

(d)        To enter and implement such orders as may be appropriate in the event the
Confirmation Order is for any reasons stayed, revoked, modified, or vacated;

(e)        To issue such orders in aid of execution and consummation of the Plan, to the
extent authorized by section 1142 of the Bankruptcy Code;

(f)        To consider any amendments to, or modifications of, the Plan, to cure any defect
or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including,
without limitation, the Confirmation Order;

11

(g)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under section 330, 331, and 503(b) of the Bankruptcy Code;

(h)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(i)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Code.

(j)     To recover all assets of the Debtor and property of the Debtors' estate, wherever located;

(k)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)     To resolve any Disputed Claims;

(m)     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code; if applicable;

(n)     To hear any other matter not inconsistent with the Bankruptcy Code; and

(o)     To enter a final decree closing the Chapter 11 Case.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.01.     Effectuation Documents and Further Transactions.     The     Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9.02     Exemption from Transfer Taxes.     Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the

12

Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation , deeds, bill of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.  All sale transactions consummated by the Debtor and approved by the Bankruptcy Court on and after the Commencement Date through and including the Effective Date, including without limitation, the transfers and surrenders effectuated under the Plan,, the sale by the Debtor of owned property pursuant to Section 363(b) of the Bankruptcy Code, and the assumption , assignment, and sale by the Debtor of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code shall be deemed to have been made under, in the furtherance of, or in connection with the Plan

and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

9.03    Payment of Statutory Fees.  On the Effective Date, and thereafter as may be required, the Debtor shall pay all fees payable pursuant to Section 1930 of Chapter 123 of Title 28 of the United State Code.

9.04    Post-Effective Date Fees and Expenses.  From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course and without the necessity for any approval by the Bankruptcy Court shall, pay the reasonable fees and expenses incurred in connection with the implementation and consummation of the Plan.

9.05    Amendment or Modification of the Plan.    Alterations, amendments, or modifications of or to the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of section 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied

13

with section 1125 of the Bankruptcy Code. The Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consumption, provided that the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warranting such alterations, amendment, or modification do not materially and adversely change the treatment of the Claim of any holder.

9.06     Revocation or Withdrawal of the Plan.  The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

9.07     Severability     If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent

with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.08     Governing Law     Except to the extent that the Bankruptcy Code or other federal law is applicable, or to extent an exhibit or schedule hereto or in any Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and

14

constructed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principals of conflict of laws thereof.

      9.10    Binding Effect.    The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of the Claims, and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

      9.11    Exhibits/Schedules.    All exhibits and schedules to the Plan, including any Plan Supplement, are incorporated into and are part of the Plan as if set forth in full herein.

      9.12    Notices.    All notices, requests, and demands to or upon the Debtor's to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Olin Construction Co., Inc.
Attention: Olin Granthum
P.O. Box 180190
Tallahassee, FL 32318

Thomas B. Woodward, Esquire
P.O. Box 10058
Tallahassee, FL 32302

Dated: August 4, 2008

Olin Construction Co., Inc.

/S/ Olin Granthum
By: Olin Granthum
Its: President

/S/ Thomas B. Woodward
Attorney for the Debtor
FL Bar No.: 0185506
P.O. Box 10058
Tallahassee, FL 32302
850-222-4818

15

## PLAN OF REORGANIZATION
## EXHIBIT A
## SECURED CREDITORS

| CLASS III/CREDITOR | | CLAIM NO.: | DEBT/ALLOWED |
|---|---|---|---|
| A. | Ameris Bank | 3 | $523,123.51 |
| B. | Superior Bank | 8 | $283,741.57 |
| C. | Superior Bank | 7 | $942,152.14 |
| D. | Wakulla Bank | 11 | $1,706,400.00 |

## PLAN OF REORGANIZATION
### EXHIBIT B
### PRIORITY CREDITORS

Doris Maloy, Tax Collector          Claim No.: 4                    $290.25

## PLAN OF REORGANIZATION
## EXHIBIT C
## UNSECURED CREDITORS

| CLASS IV/CREDITORS | CLAIM NO.: | DEBT |
|---|---|---|
| Lonnie Meirer Linda Humphries | 5 | $40,589.82 |
| Pitney Bowes Inc. | 6 | $2,152.41 |
| Zurick American Ins. Co. | 2 | $1.00 (estimated) |
| Moore Bass Consulting | NA | $1.00 |
| Olin Granthum | NA | $422,000.00 |
| Olin Properties, Inc. | NA | $337,869.98 |
| Wakulla Bank | NA | $20,635.05 |
| DeSota & Associates | NA | $38,005.00 |
| Wakulla Bank | 11 | $312,017.20 |
| Capital City Bank | 9 | $2,392.03 |
| Capital City Bank | 10 | $30,110.95 |
| Matt Groom, CPA | NA | $390.00 |

## PLAN OF REORGANIZATION
## LEASES/EXECUTORY CONTRACTS
## EXHIBIT D

**LESSOR**                **COLLATERAL**                **ASSUME/REJECT**

NONE

PLAN OF REORGANIZATION
EXHIBIT E

Beginning in the West Edge of Marine Street, at the Corner of Marine and Clara Streets, Running North along Marine Street Fifty (50) feet, thence West or Westerly to low water mark of Carrabelle River, thence Southerly along Low Water Line of Carrabelle River, Fifty (50) feet, more or less, to the North side of Clara Street, thence East along Clara Street to marine Street and to place of beginning.

Marine Street and Clara Street both shown on the Official Map of Carrabelle as Recorded in Plat Book 2 at Page 20 of the Public Records of Franklin County, Florida.

Subject property being more particularly described by a recent survey by Edwin G. Brown & Associates, Inc., dated July 16, 1991, being Job No. 91-116 (P5c#8348), as follows:

PARCEL ONE: Begin at the intersection of the West Right-of-Way Boundary of Marine Street with the North Right-of-Way Boundary of Clara Street and Proceed North Along Said West of Right-of-Way boundary 50.00 feet, thence run South 82 degrees 19 minutes 58 seconds West 47.91 feet to the Approximate mean High Water Line, thence South 19 degrees 18 minutes 56 seconds East along said approximate mean high water line 50.59 feet, more or less, thence run North 82 degrees 19 minutes 58 second East 31.02 feet, more or less to the POINT OF BEGINNING.

PLAN OF REORGANIZATION
EXHIBIT F

Lot 4, block 71, Sands of Carrabelle, A Subdivision as Per Map or Plat thereof as
Recorded in Plat Book 8, Page 12, of the Public Records of Franklin County, Florida.

PLAN OF REORGANIZATION
EXHIBIT G

Lots 1-12, Block 72 and Lots 4-9 Block 63, Sands of Carrabelle, a Subdivision as per Map or Plat as Described in Plat Book 8, Page 12 of the Public Records of Franklin County, Florida.
Also:
Lots 9 and 10, Block C, Range 2(88), Pickett's Addition to the City of Carrabelle, Franklin County, Florida, a Subdivision as per Map or Plat thereof as Recorded in Plat Book 2, Page 20, of the Public Records of Franklin County, Florida.
Also:
Lot 3 and the Southerly 40 Feet of Lot 4, and Lots 6, 8, 9 and 10, Block C, Range 3(89), Pickett's Addition to the City of Carrabelle, Franklin County, Florida, a Subdivision as per Map or Plat thereof as Recorded in Plat Book 2, Page 20, of the Public Records of Franklin County, Florida.
Also:
Lot 20, Anglers Harbor, According to the Plat thereof, Recorded in Plat Book 8, Page 8, of the Public Records of Franklin County, Florida.

PLAN OF REORGANIZATION
EXHIBIT H

Lots 1-9 and 12 through 18.  Block 46 (Old Block 25) Kelly's Plat of the City of Carrabelle, as per Map or Plat thereof Recorded in Plat Book 2, Page 20, of the Public Records of Franklin County, Florida.

## DISCLOSURE STATEMENT
## ASSETS AND LIABILITIES
## EXHIBIT 2

### ASSETS                                    FAIR MARKET VALUE

Cash                                         $ 9,000.00
Real Property*                               $ 3,,226,400.00
Accounts Receivable**                        $ 2,040,500.00
Auto/Trailers                                $ 500.00
Office Equipment                             $ 500.00

TOTAL ASSETS                                 $ 5,276,900.00

### LIABILITY                                 BALANCE

Secured Claims                               $ 3,457,417.20
Priority Secured Claims                      $ 290.25
Unsecured Claims                             $ 1,206,164.30
BKR. Admin. Claims (est.)                    $13,000.00

TOTAL LIABILITIES                            $ 4,676,600.17

* See attached
** Includes contingent pending lawsuit estimated recovery

Real Property:

| | |
|---|---|
| Commercial Lot/Carrabelle River | $575,000.00 |
| Lot 4, Block 71, Sands of Carrabelle | $225,000.00 |
| Lots 1-12, Block 72, Sands of Carrabelle | $420,000.00 |
| Lots 4-9, Block 63, Sands of Carrabelle | $100,000.00 |
| Lot 3 and the Southerly 40 feet of Lot 4 and Lots9 and 10, Block C, Range 3 (89) Pickett's Addition to the City of Carrabelle | $25,000.00 |
| Lot 20, Anglers Harbor, Franklin County | $175,000.00 |
| Lots 1-9 and 12-18, Block 46 (old block 25) Kelly's Plat of the City of Carrabelle as valued by Wakulla Bank in its filed Proof of Claim and Motion for Relief from Stay | $1,706,400.00 |

### DISCLOSURE STATEMENT
### CASH FLOW PROJECTION
### EXHIBIT 3

Post Petition Receipts                                     $10,290.64

Anticipated Pre-Confirmation payments                     <$7,000.00>

***No further cash flow is anticipated other than the potential law suit recovery referenced in this Disclosure Statement which will be used, in full, to pay unsecured claims.

## DISCLOSURE STATEMENT
## LIQUIDATION ANALYSIS
## EXHIBIT 4

| ASSET | GOING CONCERN VALUE | SECURED DEBT | LIQUIDATION VALUE |
|---|---|---|---|
| Cash on Hand | $10,290 | $0.00 | $10,290.00* |
| Real Property | $3,455,417.00 | $3,455,417.00 | $0.00 |
| Equip./vehicle | $500.00 | $0.00 | $500.00 |
| Accounts Rec'b | $2,040,500** | $0.00 | $2,000.00 |
| Office Equip. | $500.00 | $0.00 | $100.00 |

  * Subject to balance on hand after anticipated payments to Appraiser.
  ** Includes estimated recovery forum pending law suit.

DISCLOSURE STATEMENT
EXHIBIT 5

Beginning in the West Edge of Marine Street, at the Corner of Marine and Clara Streets, Running North along Marine Street Fifty (50) feet, thence West or Westerly to low water mark of Carrabelle River, thence Southerly along Low Water Line of Carrabelle River, Fifty (50) feet, more or less, to the North side of Clara Street, thence East along Clara Street to marine Street and to place of beginning.

Marine Street and Clara Street both shown on the Official Map of Carrabelle as Recorded in Plat Book 2 at Page 20 of the Public Records of Franklin County, Florida.

Subject property being more particularly described by a recent survey by Edwin G. Brown & Associates, Inc., dated July 16, 1991, being Job No. 91-116 (P5c#8348), as follows:

PARCEL ONE: Begin at the intersection of the West Right-of-Way Boundary of Marine Street with the North Right-of-Way Boundary of Clara Street and Proceed North Along Said West of Right-of-Way boundary 50.00 feet, thence run South 82 degrees 19 minutes 58 seconds West 47.91 feet to the Approximate mean High Water Line, thence  South 19 degrees 18 minutes 56 seconds East along said approximate mean high water line 50.59 feet, more or less, thence run North 82 degrees 19 minutes 58 second East 31.02 feet, more or less to the POINT OF BEGINNING.

DISCLOSURE STATEMENT
EXHIBIT 6

Lot 4, block 71, Sands of Carrabelle, A Subdivision as Per Map or Plat thereof as
Recorded in Plat Book 8, Page 12, of the Public Records of Franklin County, Florida.

DISCLOSURE STATEMENT
EXHIBIT 7

Lots 1-12, Block 72 and Lots 4-9 Block 63, Sands of Carrabelle, a Subdivision as per Map or Plat as Described in Plat Book 8, Page 12 of the Public Records of Franklin County, Florida.

Also:

Lots 9 and 10, Block C, Range 2(88), Pickett's Addition to the City of Carrabelle, Franklin County, Florida, a Subdivision as per Map or Plat thereof as Recorded in Plat Book 2, Page 20, of the Public Records of Franklin County, Florida.

Also:

Lot 3 and the Southerly 40 Feet of Lot 4, and Lots 6, 8, 9 and 10, Block C, Range 3(89), Pickett's Addition to the City of Carrabelle, Franklin County, Florida, a Subdivision as per Map or Plat thereof as Recorded in Plat Book 2, Page 20, of the Public Records of Franklin County, Florida.

Also:

Lot 20, Anglers Harbor, According to the Plat thereof, Recorded in Plat Book 8, Page 8, of the Public Records of Franklin County, Florida.

DISCLOSURE STATEMENT
EXHIBIT 8

Lots 1-9 and 12 through 18.  Block 46 (Old Block 25) Kelly's Plat of the City of
Carrabelle, as per Map or Plat thereof Recorded in Plat Book 2, Page 20, of the Public
Records of Franklin County, Florida.